# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF OKLAHOMA

(1) SHARON DALTON, as Personal )
Representative of the Estate of ANGELA )
LIGGANS, deceased, )
　)
　　　Plaintiff, )
　)
v. ) Case No.: 23-CV-139-GLJ
　)
(1) CHRIS ELLIOTT, in his official capacity )
Wagoner County Sheriff, ) JURY TRIAL DEMANDED
(2) BLAKE BODE, )
(3) HALEY LONGSHORE, ) ATTORNEY LIEN CLAIMED
(4) ASHLEY ALDRICH, D.O., )
(5) JONATHAN VILLAVICENCIO, )
　)
　　　Defendants. )

## COMPLAINT

**COMES NOW**, Plaintiff Sharon Dalton as the Personal Representative of the Estate of Angela Liggans, deceased, and for her causes of action against the above-named Defendants, alleges and states the following:

### PARTIES, JURISDICTION AND VENUE

1. Plaintiff Sharon Dalton is a citizen of Oklahoma and the duly-appointed Personal Representative of the Estate of Angela Liggans ("Ms. Liggans"). Plaintiff is Ms. Liggans' surviving mother. The survival causes of action in this matter are based on violations of Ms. Liggans' rights under the Eighth and/or Fourteenth Amendment to the United States Constitution.

2. Defendant Chris Elliott ("Sheriff Elliott" or "Defendant Elliott") is the Sheriff of Wagoner County, Oklahoma, residing in Wagoner County, Oklahoma and acting under color of state law. Sheriff Elliott is sued purely in his official capacity. It is well-established, as a matter of Tenth Circuit authority, that a § 1983 claim against a county sheriff in his official capacity "is the same as bringing a suit against the county." *Martinez v. Beggs,* 563 F.3d 1082, 1091 (10th Cir. 2009). *See*

*also Porro v. Barnes,* 624 F.3d 1322, 1328 (10th Cir. 2010); *Bame v. Iron Cnty.,* 566 F. App'x 731, 737 (10th Cir. 2014). Thus, in suing Sheriff Elliott in his official capacity, Plaintiff has brought suit against the County/Wagoner County Sheriff's Office ("WCSO"). The Wagoner County Sheriff is ultimately responsible for ensuring the safety and well-being of persons detained and housed at the Wagoner County Jail ("Jail"), including the provision of adequate medical care. In addition, the Wagoner County Sheriff is responsible for creating, adopting, approving, ratifying, and enforcing the rules, regulations, policies, practices, procedures, and/or customs of WCSO and the Jail, including the policies, practices, procedures, and/or customs closely related to the violation of Ms. Liggans' rights as set forth in this Complaint.

3.  Defendant Blake Bode ("Cpl. Bode") was, at all times relevant hereto, acting under color of state law as an employee and/or agent of Wagoner County/WCSO. Cpl. Bode was responsible, in part, for ensuring Ms. Liggans' health and well-being, and assuring that the medical and safety needs of Ms. Liggans were met, during the time she was in the custody of WCSO. Cpl. Bode is being sued in his individual capacity.

4.  Defendant Haley Longshore ("Ms. Longshore") was, at all times relevant hereto, acting under color of state law as an employee and/or agent of Wagoner County/WCSO. Ms. Longshore was responsible, in part, for ensuring Ms. Liggans' health and well-being, and assuring that the medical and safety needs of Ms. Liggans were met, during the time she was in the custody of WCSO. Ms. Longshore is being sued in her individual capacity.

5.  Defendant Ashley Aldrich ("Dr. Aldrich") was, at all times relevant hereto, acting under color of state law as an agent of Wagoner County/WCSO. Dr. Aldrich was responsible, in part, for ensuring Ms. Liggans' health and well-being, and assuring that the medical and safety needs of Ms. Liggans were met, during the time she was in the custody of WCSO. Dr. Aldrich is being sued in her individual capacity.

6. Defendant Jonathan Villavicencio ("Sgt. Villavicencio") was, at all times relevant hereto, acting under color of state law as an employee and/or agent of Wagoner County/WCSO. Sgt. Villavicencio was responsible, in part, for ensuring Ms. Liggans' health and well-being, and assuring that the medical and safety needs of Ms. Liggans were met, during the time she was in the custody of WCSO. Sgt. Villavicencio is being sued in his individual capacity.

7. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343 to secure protection of and to redress deprivations of rights secured by the Eighth and/or Fourteenth Amendments to the United States Constitution as enforced by 42 U.S.C. § 1983, which provides for the protection of all persons in their civil rights and the redress of deprivation of rights under color of law.

8. The jurisdiction of this Court is also invoked under 28 U.S.C. § 1331 to resolve a controversy arising under the Constitution and laws of the United States, particularly the Eighth and/or Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

9. Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## STATEMENT OF FACTS

10. Paragraphs 1-9 are incorporated herein by reference.

- **Facts Specific to Ms. Liggans**

**May 17, 2021**

11. Ms. Liggans was booked into the Wagoner County Jail on May 17, 2021.

12. Ms. Liggans was an insulin-dependent Type 1 diabetic, requiring daily blood sugar monitoring and insulin injections.

13. Upon booking, Ms. Liggans brought with her a medication bag that contained insulin bottles, hypodermic needles, glucose tabs and numerous prescription medications.

14. A "Fit for Incarceration" form was filled out by the booking officer. The "Fit for Incarceration" form indicates that at the time of booking, Ms. Liggans was experiencing: (a) a cough; (b) "shortness of breath or difficulty breathing"; (c) body aches; (d) "congestion or runny nose"; (e) nausea or vomiting; and (f) diarrhea. In addition, Ms. Liggans reported a number of medical conditions that needed immediate attention, including "COPD", diabetes, "unknown heart problem" and "scoliosis".

15. The booking officer further noted that Ms. Liggans appeared to be under the influence of a known or unknown intoxicant.

16. While in the booking area, Ms. Liggans, knowing that she was in need of insulin to treat her severe diabetes, grabbed ahold of her medication bag, which had not been secured by the Wagoner County Jail detention staff. Ms. Liggans attempted to administer insulin to herself, as part of her daily routine. Wagoner County Sheriff's Office ("WCSO") detention officers on duty, including Sgt. Elliott Voris-Knabe and Cpl. Bode, physically took the insulin from Ms. Liggans. Cpl. Bode then forcibly took Ms. Liggans to the ground and handcuffed her. Bode and Voris-Knabe placed her in the Jail's restraint chair. Ms. Liggans was left in the restraint chair for approximately one (1) hour and ten (10) minutes. While in the restraint chair, she continued to demand her insulin, but none was given.

**May 18, 2021**

17. At approximately 3:30 a.m., Ms. Liggans was given a "medical" screening, by Haley Longshore, a "Medical Assistant", and Sgt. Zarya Roe, a non-medical detention supervisor.

18. "Medical Assistants" are not recognized as medical professionals under Oklahoma law. A Medical Assistant is not a nurse and is lesser trained than a Registered Nurse ("RN") or even a Licensed Practical Nurse ("LPN"). A Medical Assistant's scope of practice is extremely limited, and typically includes tasks such as fielding phone calls and messages, taking vital signs

and rooming patients. Medical Assistants cannot practice medicine as a matter of law. Importantly, Medical Assistants, like Ms. Longshore, are prohibited from diagnosing medical conditions, medically assessing patients or prescribing medication. And Medical Assistants cannot provide any care whatsoever without the supervision of a physician.

19. Despite Ms. Longshore's lack of training and limited scope of practice, the Sheriff hired her to serve as the Jail's "Health Administrator." As "Health Administrator", Ms. Longshore was responsible for overseeing the medical department inside the Wagoner County Jail. However, Ms. Longshore was the only "medical" staff on site at the Jail. As the Jail's "Health Administrator", her duties included "medically" training detention officers, ensuring proper documentation was being completed and ensuring inmates' medical needs were being met. Ms. Longshore, as a Medical Assistant, was obviously not competent to perform any of these duties.

20. During the Medical Screening, Ms. Liggans once again reported that she was experiencing: (a) a cough; (b) "shortness of breath or difficulty breathing"; (c) body aches; (d) "congestion or runny nose"; (e) nausea or vomiting; and (f) diarrhea. The Medical Screening form additionally shows that Ms. Liggans was suffering from numerous symptoms of tuberculosis ("TB"), including "night sweats", "persistent cough", "loss of appetite", "chest pains", "coughing up blood" and "abnormal weight loss". In addition, Ms. Liggans apparently told Ms. Longshore that she was feeling suicidal. Ms. Liggans specifically reported that she was *"**diabetic**"* and *"**hypoglycemic**"*.

21. Ms. Liggans' blood sugar was recorded at ***"586"***. This is a dangerously elevated blood sugar level, approaching diabetic hyperosmolar syndrome.

22. Under "Medical Problems/Concerns Report by Patient", Ms. Longshore noted that Ms. Liggans had been "taking xanax for 20 years for anxiety & Gabapentin for nerve pain for several years roughly". Ms. Longshore further observed that Ms. Liggans was "shaking", a sign of withdrawal.

5

23. Lastly, Ms. Liggans reported that she suffered from "***severe anxiety and PTSD*** from being raped and abused…."

24. Based on her Medical Screening, Ms. Liggans was initially placed on suicide watch.

25. After being cleared from suicide watch by Ms. Longshore, Ms. Liggans was placed in a holding cell for one (1) day, not to monitor her medical and mental health condition, but to "ensure she will behave…."

26. Ms. Longshore informed the Jail's off-site physician, Ashley Aldrich, D.O. ("Dr. Aldrich"), via text message, of Ms. Liggans' condition, including her diabetes and recent finger stick blood sugar ("FSBS") of 586.

27. At approximately 6:45 p.m., Ms. Liggans requested a blood sugar check. "J Scruggs", a non-medical detention officer, recorded Ms. Liggans FSBS as 362.

**May 25, 2021**

28. On May 25, 2021, at 8:12 a.m., Ms. Longshore sent a text message to Dr. Aldrich informing her that Ms. Liggans was "crying a lot", having "bad anxiety and depression" and "really bad PTSD."

**May 28, 2021**

29. On May 28, at approximately 12:46 p.m., Ryan Russell, the Jail Administrator, entered a "Nurse Visit" form into Ms. Liggans' medical chart. However, Mr. Russell is not a nurse and there is no indication that Ms. Liggans was seen by a nurse. In the form, the Jail Administrator states: "Inmate Liggans passed out in FPOD and was escorted by officers to medical. Inmate [L]iggans sta[r]ted to feel weak and had temporary hearing loss." The Jail Administrator also recorded Ms. Liggans pulse as 124, which is tachycardic. Ms. Liggans was not seen by a physician or a nurse and was not sent to the hospital.

30. After being given insulin by non-medical staff, Ms. Liggans was returned to F-Pod.

6

**May 29, 2021**

31. At approximately 8:00 p.m. on May 29, 2021, Cpl. Bode and an "Officer Hardcastle" received a radio call to go to F-Pod because Ms. Liggans had called the "tower" and reported she was having a medical issue. When Bode and Hardcastle arrived at F-Pod, they observed Ms. Liggans in an acute state of psychosis. For instance, Ms. Liggans stated she could hear "Amber" screaming for her. Ms. Liggans then began to cry and ask what she had done wrong. Cpl. Bode asked Ms. Liggans if she wanted a blood sugar check. Ms. Liggans began to cry again and stated that she did not know. Cpl. Bode took Ms. Liggans to "medical." However, there was no medical staff on site.

32. When Ms. Liggans entered the "medical" office, she began to hyperventilate and shake. Cpl. Bode check her blood sugar. It was 575, dangerously elevated. Cpl. Bode attempted to inject Ms. Liggans with insulin, but she "was shaking so much she was having a hard time drawing the insulin…." Ms. Liggans raised her voice and yelled, "No! I want both of you here! I'm putting my foot down this time!" Ms. Liggans then reported that other inmates in the F-Pod had threatened her and called her crazy. She began to cry again. Cpl. Bode and Officer Hardcastle took Ms. Liggans back to F-Pod. They did not call a doctor or a nurse. Rather, Cpl. Bode entered a "Progress Note" into Ms. Liggans' medical chart. Ms. Liggans was not seen by a physician or a nurse and was not sent to the hospital.

33. Officer Hardcastle noted, in Ms. Liggans' medical chart, that at around 8:30 p.m. on May 29, "Liggans was in booking in order to calm her down as she had been having panic attacks…." More than this, Ms. Liggans was actively hallucinating. Specifically, at one point, Ms. Liggans asked Hardcastle if he "could get the papers of her son before he went into that house" while pointing at a printer in booking. When Officer Hardcastle asked her what she meant, Ms.

7

Liggans began begging. Hardcastle informed Ms. Liggans that the printer was not a house and her son was not there. She began staring at the floor.

34. Hallucinations are a symptom of extremely high blood sugar. Even to a layperson, Ms. Liggans' onset of bizarre behavior, including visual hallucinations, provided clear evidence that she needed urgent and emergent medical and/or psychiatric care. However, there is no indication that Officer Hardcastle called a physician, nurse or mental health professional. She was not assessed or seen by a doctor or nurse. She was not sent to the hospital. Rather, Officer Hardcastle once again, escorted Ms. Liggans back to F-Pod.

**May 30, 2021**

35. According to log kept by WCSO, on May 30, Ms. Liggans refused a FSBS check offered by Sgt. "C Sloan". There is no indication that a physician, nurse, or even Ms. Longshore, was notified.

36. At approximately 9:40 p.m. on May 30, Ms. Liggans asked Cpl. Bode to check her blood sugar. The reading was 324. Because he has no medical training whatsoever, Cpl. Bode asked Ms. Liggans if 324 was "high". She replied, "yes." Cpl. Bode then called Dr. Aldrich and she advised him to provide Ms. Liggans with 5 units of "Novolog" insulin.

**May 31, 2021**

37. As documented by Cpl. Bode and Sgt. Sloan, Ms. Liggans declined two a FSBS checks on May 31, 2021. There is no indication that a physician, nurse, or even Ms. Longshore, was notified.

38. Ms. Liggans was provided with no insulin on May 31.

39. After 24 hours without insulin, a person with Type 1 diabetes, like Ms. Liggans, will likely begin showing signs of Diabetic Ketoacidosis, or "DKA". DKA is a life-threatening complication of diabetes that occurs when one's body produces high levels of blood acids called

8

ketones. Thus, the failure to provide Ms. Liggans with insulin on May 31 created an emergent situation. Yet, with deliberate indifference, no physician was called and she was not taken to the hospital.

40. According to the Mayo Clinic, symptoms of DKA include: excessive thirst, weakness or fatigue, shortness of breath and confusion. Ms. Liggans' hydration was not monitored by WCSO. But she continued to display signs of extreme confusion, and even psychosis, as well as weakness and fatigue.

41. For instance, when Sgt. Sloan saw Ms. Liggans in the morning, she was "acting like she can't move and [wa]s refusing" FSBS check.

42. On the evening of May 31, Ms. Liggans pressed the "pending call" button in her cell to summon detention staff. Cpl. Bode saw Ms. Liggans -- in F-Pod -- at around 6:55 p.m. There was blood on the floor of her cell. Ms. Liggans told Bode that he had cut her eye out. Of course, Cpl. Bode had not cut her eye out and Ms. Liggans' eyes appeared fine. Cpl. Bode believed the blood on the floor was menstrual blood and provided Ms. Liggans with pads. Ms. Liggans' blood pressure was high and her pulse rate was tachycardic.

43. Ms. Liggans' acute psychosis worsened as the night progressed. At around 9:15 p.m., Cpl. Bode checked on Ms. Liggans again. This time, Ms. Liggans stated: "My mom is bound by a chain around her neck. She died a few days ago and she's been in here with me ever since." Once again, it was apparent that Ms. Liggans was actively hallucinating. Hallucinations are a symptom of extremely high blood sugar. Even to a layperson, Ms. Liggans' onset of bizarre behavior, including visual hallucinations, provided clear evidence that she needed urgent and emergent medical and/or psychiatric care. However, there is no indication that Cpl. Bode called a physician, nurse or mental health professional. She was not assessed or seen by a doctor or nurse. She was not sent to the hospital.

**June 1, 2021**

44. Ms. Liggans continued to outwardly display bizarre and psychotic behavior on June 1. For instance, at around 2:45 a.m., Ms. Liggans asked Sgt. Sloan to "check on the eggs her mother gave her." Sgt. Sloan recorded Ms. Liggans FSBS as 423, which is extremely high. Ms. Liggans asked for insulin, but was unable to dress herself to go to the "medical" office and was confused about whether she would be placed on "lock down." Sgt. Sloan notified Ms. Longshore.

45. Ms. Longshore then called Dr. Aldrich. Dr. Aldrich was specifically notified that Ms. Liggans was "hallucinating and refusing treatment…." Although Ms. Liggans' blood sugar was high, she had gone well over 24 hours without insulin and was showing signs of severe confusion and psychosis – consistent with DKA – neither Ms. Longshore nor Dr. Aldrich ordered that she be sent to the hospital. This was deliberate indifference to a serious medical need.

46. Later in the morning of June 1, 2021, Ms. Liggans was so weak that she could not get out of bed. No FSBS check was performed. There is no indication that a physician, nurse, or even Ms. Longshore, was notified. She was not sent to the hospital.

47. According to WCSO documentation, Ms. Liggans declined another FSBS check on the afternoon of June 1. There is no indication that a physician or nurse was notified. She was not sent to the hospital.

48. Ms. Liggans was provided with no insulin on June 1.

49. Going at least 48 hours without insulin, Ms. Liggans was undoubtedly in the throes of DKA. The failure to send her to the hospital, or even provide a face-to-face physician assessment constitutes deliberate indifference to a serious medical need.

**June 2, 2021**

50. Throughout the day on June 2, 2021, Cpl. Bode observed Ms. Liggans' "strange

demeanor" on numerous occasions. As Cpl. Bode would later report, Ms. Liggans was "unsteady on her feet" and would repeatedly fall to the floor of her cell (F10). Nonetheless, despite knowing of Ms. Liggans' dangerously fragile health and deterioration over the course of several days, Cpl. Bode did nothing to assist Ms. Liggans.

51. On the afternoon of June 2, an officer in the Jail's "tower" observed Ms. Liggans throwing herself on the ground and purposely trying to hurt herself. At approximately 2:00 p.m., Sgt. Jonathan Villavicencio was called to the tower. Sgt. Villavicencio witnessed Ms. Liggans slam herself onto her bunk. Rather than immediately call 911, a physician, or even a nurse, Sgt. Villavicencio and Cpl. Bode decided to move Ms. Liggans from F10 to Holding Cell 1 in booking.

52. Ms. Liggans was in an obviously dire condition. When Sgt. Villavicencio and Cpl. Bode arrived at F10, Ms. Liggans was "confused" as she had been for "several days." She fell to her knees. She was so weak that she could not walk on her own. Once again, this was an obvious medical emergency. But, rather than call 911, Sgt. Villavicencio and Cpl. Bode carried Ms. Liggans' limp and nearly lifeless body to Holding Cell 1, and left her there unattended. This was yet another instance of deliberate indifference.

53. At approximately 2:30 p.m., the tower officer asked Officer Villavicencio and Sgt. Sloan to check on Ms. Liggans because she had been laying "in the same position for 30 minutes." When Sgt. Sloan and Officer Villavicencio entered Holding Cell 1, they noted that Ms. Liggans was motionless, unresponsive and "completely discolored." Cpl. Laci Chandler arrived and attempted CPR. Sgt. Sloan brought the Jail's Automated External Defibrillator ("AED") into the cell and struggled to use it. The AED was inoperable, generating a message, "the pads are not plugged into the machine."

54. At 2:39 p.m., EMS arrived and stated that AED was "dead or low on battery". Shortly thereafter, EMS declared Ms. Liggans dead.

11

55.   For many days, it was obvious that Ms. Liggans' conditions could not be effectively or safely treated in a correctional setting. Yet, despite the obvious and excessive risks to her health and safety, Cpl. Bode, Ms. Longshore, Dr. Aldrich and/or Sgt. Villavicencio, and others, refused to send her to the hospital or other facility with a higher level of care.

**Medical Examiner's Report**

56.   The Office of the Chief Medical Examiner performed an autopsy. In the Medical Examiner's Report, it is noted that Ms. Liggans "had been exhibiting abnormal behavior including presumed hallucinations for several days prior to death." The Medical Examiner found that Ms. Liggans "died as a result of diabetes ketoacidosis." She was just 41 years old.

■ **Policies, Customs and Practices of the WCSO/Wagoner County Sheriff**

57.   There is an affirmative link between the unconstitutional acts and/or omissions of employees or agents of the County/WCSO, as described supra, including Cpl. Bode, Ms. Longshore, Dr. Aldrich and/or Sgt. Villavicencio, and policies, practices and/or customs which the County/WCSO promulgated, created, implemented and/or possessed responsibility for.

58.   To the extent that no single officer violated Ms. Liggans' constitutional rights, the Sheriff/County/WCSO is still liable under a theory of a systemic failure of medical policies and procedures as described below. There were such gross deficiencies in staffing, facilities, equipment and procedures, at the Jail, that Ms. Liggans was effectively denied constitutional conditions of confinement.

59.   County sheriffs may be held liable for the maintenance of an unconstitutional health care delivery system. As devised by Sheriff Elliott, the Jail has no functioning medical delivery system, ensuring that detainees with serious and/or complex medical or mental health needs, like Ms. Liggans, will be deprived of constitutionally adequate medical and mental health care.

60.   The Sheriff maintained a policy or custom of insufficient medical staffing, resources,

and training, chronic delays in care and indifference toward medical needs at the Wagoner County Jail.

61. At all pertinent times, there was systemic failure of medical policies and procedures at the Jail.

62. At all pertinent times, there were such gross deficiencies in medical staffing, facilities, equipment, and procedures that Ms. Liggans was effectively denied access to adequate medical care.

63. As a matter of policy practice and custom, the Sheriff failed to staff the Jail qualified professionals, failed to provide reasonable access to a physician and emergent medical care and failed to supervise the Jail's medical delivery system.

64. As a matter of policy practice and custom, employees at the Jail, who are entrusted to ensure that detainees receive necessary medical care receive no meaningful medical or mental health training and are not qualified or legally permitted to medically assess, evaluate or diagnose serious or complex medical or mental health conditions. As a matter of policy, custom and practice, employees at the Jail with no medical or mental training, primarily lay detention staff, are tasked with identifying medical conditions and making medical decisions.

65. As a matter of policy practice and custom, the Sheriff failed to staff the Jail with *any* qualified medical personnel and appointed Ms. Longshore, a "Medical Assistant", as the Jail's as the Jail's "Health Administrator". As "Health Administrator", Ms. Longshore was responsible for overseeing the medical department inside the Wagoner County Jail. However, Ms. Longshore was the only "medical" staff on site at the Jail. As the Jail's "Health Administrator", her duties included "medically" training detention officers, ensuring proper documentation was being completed and ensuring inmates' medical needs were being met. Ms. Longshore, as a Medical Assistant, was obviously not competent to perform *any* of these duties.

66. The Sheriff left it to the "common sense" of his untrained detention staff to determine whether an inmate had a serious medical condition and needed emergent care.

67. WCSO has an established practice of failing to train staff on what constitutes alarming vital signs; when to report alarming vital signs to a physician; and failing to send inmates with complex and serious medical and mental health needs to an outside medical facility for an adequate assessment and treatment.

68. Many of these failures stem from financial incentives to avoid the costs of inmate prescription medications and off-site treatment.

69. On information and belief, the Sheriff's/WCSO's policies, practices, and customs, as described supra, have resulted in deaths or negative medical outcomes in numerous cases, in addition to Ms. Liggans.

70. By instituting such a medical delivery "system", the Sheriff has utterly failed to ensure that detainees and inmates are provided with clinical supervision from qualified staff. And the Sheriff himself failed to supervise the Jail's medical delivery "system".

71. In the municipal liability context, deliberate indifference is an objective standard which is satisfied if the risk is so obvious that the official should have known of it. The Sheriff/County/WCSO was charged with maintaining a constitutionally firm medical delivery system. Instead, as described herein, the County effectively maintained no medical delivery system at all. At a minimum, the Sheriff/County/WCSO knew, or should have known, of the substantial risks inherent in maintaining his facially deficient "system".

## CAUSE OF ACTION

### VIOLATION OF MS. LIGGANS' CONSTITUTIONAL RIGHT TO ADEQUATE MEDICAL / MENTAL HEALTH CARE
(42 U.S.C. § 1983)

A.  **Individual Liability/Underlying Violations**

72. Paragraphs 1-71 are incorporated herein by reference.

73. Ms. Liggans had medical and mental health needs that were sufficiently serious, objectively, to be of a Constitutional dimension.

74. As described above, numerous employees or agents of the Sheriff/County/WCSO, including Cpl. Bode, Ms. Longshore, Dr. Aldrich and Sgt. Villavicencio, knew -- or it was obvious -- that Ms. Liggans was at substantial risk of serious harm.

75. Cpl. Bode, Ms. Longshore, Dr. Aldrich and Sgt. Villavicencio, and other employees or agents of the Sheriff/County/WCSO, disregarded these known and obvious risks in deliberate indifference to Ms. Liggans' serious medical needs.

76. It was obvious that Ms. Liggans needed an immediate and emergent medical evaluation and treatment from a physician, but such services were denied, delayed and obstructed.

77. Under the circumstances, Cpl. Bode, Ms. Longshore, Dr. Aldrich and Sgt. Villavicencio had a duty and obligation to assure that Ms. Liggans received treatment or access to medical personnel capable of evaluating the need for treatment. They did neither, in deliberate indifference to Ms. Liggans' serious medical and mental health needs.

78. As a direct and proximate result of this deliberate indifference, as described above, Ms. Liggans experienced unnecessary physical pain, a worsening of her condition, severe emotional distress, mental anguish, lost wages, a loss of quality and enjoyment of life, loss of consortium, terror, degradation, oppression, humiliation, embarrassment, and death.

79. As direct and proximate result of Defendants' conduct, Plaintiff is entitled to pecuniary and compensatory damages. Plaintiff is entitled to damages due to the deprivation of Ms. Liggans' rights secured by the U.S. Constitution, including punitive damages.

**B. Official Capacity Liability (Against Sheriff Elliott)**

80. Paragraphs 1-79 are incorporated herein by reference.

81. There is an affirmative link between the unconstitutional acts and/or omissions of employees or agents of the County/WCSO, as described supra, including Cpl. Bode, Ms. Longshore, Dr. Aldrich and/or Sgt. Villavicencio, and policies, practices and/or customs which the County/WCSO promulgated, created, implemented and/or possessed responsibility for.

82. To the extent that no single officer violated Ms. Liggans' constitutional rights, the Sheriff/County/WCSO is still liable under a theory of a systemic failure of medical policies and procedures as described herein. There were such gross deficiencies in staffing, facilities, equipment and procedures, at the Jail, that Ms. Liggans was effectively denied constitutional conditions of confinement.

83. Such policies, customs and/or practices are specifically set forth in paragraphs 57-71, *supra*.

84. The County/WCSO, through its continued encouragement, ratification, approval and/or maintenance of the aforementioned policies, customs, and/or practices; in spite of their known and obvious inadequacies and dangers; has been deliberately indifferent to detainees', including Ms. Liggans', health and safety.

85. As a direct and proximate result of the aforementioned customs, policies, and/or practices, Ms. Liggans suffered injuries and damages as alleged herein.

**WHERFORE,** based on the foregoing, Plaintiff prays this Court grant the relief sought, including but not limited to actual and compensatory damages in excess of Seventy-Five Thousand Dollars ($75,000.00), with interest accruing from the date of filing suit, the costs of bringing this action, a reasonable attorneys' fee, along with such other relief as is deemed just and equitable.

Respectfully,


/s/ Robert M. Blakemore
Daniel Smolen, OBA #19943
Robert M. Blakemore, OBA #18656
Bryon D. Helm, OBA #33003
**Smolen & Roytman**
701 South Cincinnati Avenue
Tulsa, OK 74119
Phone: (918) 585-2667
Fax:    (918) 585-266

***Attorneys for Plaintiff***

17